# IN THE UNITED STATES DISTRICT COURT
## FOR THE  DISTRICT OF MASSACHUSETTS

KINGVISION PAY- PER- VIEW CORP., LTD )

       Plaintiff, )
v. )
                    )   01- 40099- NMG
TORRI CANADA )
and MICHAEL ANDREJEWSKI )
                    )
       Defendant. )

### PLAINTIFF'S MEMORANDUM OF LAW
### IN SUPPORT OF REQUEST FOR JUDGMENT BY DEFAULT

Plaintiff, KINGVISION PAY- PER- VIEW CORP., LTD, by its attorney, Gary D. Berkowitz, Esq. files this Memorandum of Law and says:

## POSTURE OF THIS CASE

On June 11, 2001 Plaintiff filed suit against THE MEN'S BAR, INC. and Torri Canada . The lawsuit charged the Defendants with a violation of Section 705 of the Federal Communications Act of 1934, as amended, 47 U.S.C. §605 (the "Statute").

Upon the failure of the Defendant, THE MEN'S BAR, INC. and Torri Canada, to timely file an Answer or any other responsive pleading, the Plaintiff filed and requested that a default judgment be entered against the Defendant. A default was so entered. Pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure, a default judgment is appropriate.   Plaintiff served both Torri Canada and the Corporation on April 27, 2005

Once a default judgment is entered, "it generally is treated as a conclusive and final adjudication of the issues necessary to justify the relief awarded and is given the same effect as between the parties as a judgment rendered after a trial on the merits." Wright, Miller & Kane, Federal Practice and Procedure, §2684, p. 419-20. Therefore, all of the facts alleged in the Complaint should be considered as true and are binding on the Defendant. See Danning v. Lavine, 572 F.2d 1386, 1388 (9th Cir. 1978); Wright, §2688, p.444. Accordingly, the only issue remaining to be decided in this case is the amount of damages to which Plaintiff is entitled from the Defendant as a result of her violation of the Statute.

## FACTS

KINGVISION PAY- PER- VIEW CORP., LTD entered into a closed-circuit television license to broadcast the March 1, 2003 Championship boxing match between Roy Jones, Jr. And John Ruiz, from Las Vegas, Nevada  including undercard or preliminary bouts,  (the boxing match and all related bouts are collectively referred to as the "Event"), at closed-circuit locations such as

theaters, arenas, bars, clubs, lounges, restaurants and the like throughout MASSACHUSETTS.

In the State of MASSACHUSETTS, the Event was legally available to the public only through very limited means. A commercial establishment, such as a bar, restaurant or lounge, could receive and broadcast the Event only after entering into a contractual agreement with KINGVISION PAY- PER- VIEW CORP., LTD. A residential cable subscriber could only obtain the Event by purchasing it for an additional fee through the subscriber's residential pay-per-view cable system.

The interstate satellite transmission of the Event was electronically coded or scrambled and was not intended for the use of the general public. If a commercial establishment was authorized by KINGVISION PAY- PER- VIEW CORP., LTD to receive the Event, it was provided with the electronic decoding equipment and the satellite coordinates necessary to receive the signal. For an authorized residential pay-per-view customer to receive the Event, its cable system would "authorize" the residential converter to enable it to be capable of unscrambling the transmission.

The authorized commercial establishments which contracted with KINGVISION PAY- PER- VIEW CORP., LTD were required to pay to KINGVISION PAY- PER- VIEW CORP., LTD a sublicense fee. In addition, these establishments were contractually required to charge their patrons an admission fee for attending the exhibition of the Event.

The Defendant is the owner and/or operator of THE MEN'S BAR, INC. d/b/a M & M Tavern, a commercial establishment located at 4 Monument Square in Leominster. On April 29, 2000, without authorization, the Defendant or agents, servants and/or employees of the Defendant intercepted and received or assisted in the interception and receipt of the transmission of the Event. They thereupon broadcast or assisted in the broadcast of the Event to the patrons of M & M Tavern.

On the night of the Event, Cody Waller, an agent of the national Anti- Piracy Association, observed the Event being telecast to the patrons of M & M Tavern. A copy of his Affidavit is attached hereto as Exhibit A and incorporated herein by reference. While the Event was being broadcast in M & M Tavern, Cody Waller observed that there were approximately fifteen patrons located on the premises.

As KINGVISION PAY- PER- VIEW CORP., LTD maintained proprietary rights in the signal of the Event, all unlawful acts of interception, receipt and broadcast of the signal by the Defendant were in violation of KINGVISION PAY- PER- VIEW CORP., LTD's rights and caused the Plaintiff to suffer damages.

## DAMAGES UNDER THE COMPLAINT

### *The Statute in General*

The Statute provides inter alia that:

[n]o person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit

of another not entitled thereto.

47 U.S.C. §605(a). Thus, it protects against the theft of satellite communications such as the Event. See e.g., Cimenelli v. Cablevision, 583 F.Supp. 158, 161 (E.D.N.Y. 1984); Cablevision Systems Development Co. v. Annasonic Electronic Supply, No. CV-83-5189 (E.D.N.Y. March 10, 1984); Cablevision Systems Coup. v. DePalma, No. CV 87-3528 (E.D.N.Y. January 17, 1989); California Satellite Systems v. Seimon, 767 F.2d 1364 (1985); Quincy Cablesystems, Inc. v. Sully's Bar, Inc., 640 F.Supp. 1159 (D. Mass. 1986); National Subscription Television v. S & H TV, 644 F.2d 820 (9th Cir. 1981); National Football League v. Alley, Inc., 624 F.Supp. 6 (S.D. Fla. 1983). Accordingly, all acts of unlawful interception, receipt and broadcast of the signal of the Event were in violation of the Statute.

In order to deter the unlawful use of communications such as the Event, Congress specifically designed the Statute to provide "both Prosecutor[s] and civil plaintiffs [with] the legal tools they need to bring piracy under control." Trademark & Satellite Acts, P.L.-6678, 1988 U.S. Cong. & Admin. News 7, 5577, 5658; See U.S. v. Scott, 783 F.Supp. 280, 281 (N.D. Miss. 1992). Therefore, the Statute includes severe penalties, both civil and criminal, for those who intercept, receive and/or broadcast protected communications. See Scott, 783 F.Supp. at 281; See generally §605(e).[1] Moreover, Congress has equated a violation of the Statute to theft of service. See 1988 U.S. Code Cong. & Admin. News. 7, 5577, 5642-43. In 1988, in an effort to further deter theft, Congress amended the Statute to provide for more severe penalties for violations. Id. at 5657.

Accordingly, a party aggrieved under the Statute may recover statutory damages of up to $10,000.00 for each violation thereof. §605(e)(3)©(i)(II). Moreover, if the Court finds that the violation of the Statute was committed "willfully and for purposes of direct or indirect commercial advantage or private financial gain..." the Court may award additional damages of up to $100,000.00 for each violation. §605(e)(3)©(ii). Furthermore, a Court shall award full costs, including reasonably attorneys' fees. §605(e)(3)(B)(iii). Because KINGVISION PAY- PER- VIEW CORP., LTD constitutes an aggrieved party under the Statute, see §605(D)(6), KINGVISION PAY- PER- VIEW CORP., LTD is entitled to damages from the Defendant for her unlawful acts.

It is obvious that the Defendant's interception, receipt and broadcast of the Event was not innocent. Section 605(e)(3)©(iii) provides for limited damages to the aggrieved party "[i]n any case where the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of this section..." However, as stated by Congress, this type of situation occurs rarely,

> [i]t is not intended that this provision serve in any way as a defense to a determination of liability under subsection (a), but rather only as a provision to be exercised in the court's discretion for those rare instances of ignorance of the law on the part of one adjudged to have violated it.

Cable Communications Policy Act, P.L. 98-549, 5 U.S. Cong. News. '84 Bd. Vol. 8, 4745, 4751. Clearly, this was not the instant situation.

---

[1] The criminal penalties include fines and imprisonment. See §605(e)(1) and (e)(2).

As M & M Tavern is a commercial establishment, it could not have obtained the transmission or the Event had the Defendant not undertaken specific wrongful actions to intercept and/or receive and broadcast the telecast. In order for an unauthorized commercial establishment to receive a broadcast such as the Event, there must be some wrongful action, such as using an unauthorized decoder, obtaining cable service and illegally altering the cable service to bring the signal of the Event into the establishment or moving an unauthorized decoder from its authorized location to the establishment. Because the Defendant must have committed wrongful acts in order to intercept and/or receive and broadcast the Event, there is no basis for limiting KINGVISION PAY- PER- VIEW CORP., LTD's relief to the $10,000 provided for in §605(e)(3)©(i).

Statutory Damages Under §605(e)(3)©(i)(II)

As its first basis for relief, KINGVISION PAY- PER- VIEW CORP., LTD is requesting statutory damages pursuant to §605(e)(3)©(i)(II). See Cable/Home Communication Corp. v. Network Productions, Inc., 902 F.2d 829, 850 (11th Cir. 1990)[2] Pursuant to the Statute, the amount of statutory damages to which KINGVISION PAY- PER- VIEW CORP., LTD is entitled for the violation shall be not less than $1,000.00 and not more than $10,000.00.

For the reasons set forth, KINGVISION PAY- PER- VIEW CORP., LTD believes it is entitled to full statutory damages in the amount of $10,000.00 for the violation of the Statute.

As stated supra, on January 16, 1999, the Defendant or agents, servants and/or employees of the Defendant intercepted and received or assisted in the interception and receipt of the live telecast of the Event. They then broadcast or assisted in the broadcast of the Event to the patrons at M & M Tavern for viewing therein. The patrons at M & M Tavern purchased meals and/or drinks while viewing the Event. The patrons whom the Defendant permitted without authorization to view the Event would otherwise only have been able to view the Event at a commercial establishment by paying an admittance fee at an establishment authorized by the Plaintiff to receive the transmission.

Approximately 90 patrons of M & M Tavern were observed at 10:50 p.m. by Michael Chouinard, whose affidavit is attached hereto. At that time, the "undercard" (preliminary bouts prior to the principal bout featuring Lennox Lewis) was still being shown. M & M Tavern charged a "cover charge' of three dollars ($3.00) for admittance.

The Defendant broadcast the Event to the patrons at M & M Tavern without paying any sublicense fees to the Plaintiff. To date, no amount has been paid to KINGVISION PAY- PER- VIEW CORP., LTD to compensate it for the illegal broadcast of the Event in M & M Tavern. Statutory damages are appropriate where actual damages are difficult to prove. Lauratex Textile Corp. v. Allton Knitting Mills, Inc., 519 F.Supp. 730, 732 (S.D.N.Y. 1981); Lottie Jonlin Thomas Trust v. Crown Publishers, Inc., 592 F.2d 651, 657 (2d Cir. 1978). The lack of adequate proof of any particular element causes the Court to rely, within its discretion, on the statutory limitations. F.W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 233 (1952). In the

---

[2]  It is in the Plaintiff's discretion whether to elect to receive actual or statutory damages. Id.

4

instant case, as more fully discussed infra, it would be impossible to determine the full extent of the profits lost by the Plaintiff and the additional damages sustained by the Plaintiff as a result of the Defendant's unlawful actions.

Accordingly, it is appropriate for KINGVISION PAY- PER- VIEW CORP., LTD to elect to receive statutory damages.

Because the Statute defining statutory damage awards for violations of the Copyright Act of 1976, 17 U.S.C. §101 et seq. (the "Copyright Act") is similar to the Statute, its case law is instructive for the determination of the amount of statutory damages to which KINGVISION PAY- PER- VIEW CORP., LTD is entitled.[3]

According to the United States Supreme Court, when determining the applicable statutory damage award under the Copyright Act, the amount of profits lost by the copyright holder is not the only criteria for a Court to consider. Woolworth, 344 U.S. at 233. Rather,

> a rule of liability which merely takes away the profits from an infringement would offer little discouragement to infringers. It would fall short of an effective sanction for enforcement of the copyright policy. The statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct. The discretion of the court is wide enough to permit a resort to statutory damages for such purposes. Even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy.

Id. at 233.

Statutory damages under the Copyright Act should serve to compensate the copyright owners and to provide a detriment to would be infringers. Lottie Joplin Thomas Trust, 592 F.2d at 657; Lauratex, 519 F. Supp. at 732. Factors to consider in determining a statutory damage award include: (1) "the market value of the rights infringed", (2) "the revenue lost by the plaintiff and profits gained by the defendant", (3) "the infringers state of mind" and (4) "deterrence of future infringement: Basic Books, Inc. v. Kinko's Graphics Corp., 758 F.Supp. 1522, 1544 (S.D.N.Y. 1991).

The sublicense fees which KINGVISION PAY- PER- VIEW CORP., LTD charges to an authorized commercial establishment are based upon specific factors, including the capacity of the bar. The Foster Affidavit establishes that the capacity of M & M Tavern is at least 50 patrons. See Exhibit A. Thus, based on its capacity, KINGVISION PAY- PER- VIEW CORP.,

---

[3]    17 U.S.C. §504(c)(1) provides as follows:

**Statutory damages**. (1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum not less than $500 or more than $20,000 as the court considers just.

LTD would have requested from M & M Tavern a sublicense fee of approximately $1,000 in order to authorize it to broadcast the Event.

Applying the Courts' analysis from its decisions under the Copyright Act, in the instant case, the lost income from the sale of the Event to KINGVISION PAY- PER- VIEW CORP., LTD represents only a starting place for the determination of the amount of damages to which KINGVISION PAY- PER- VIEW CORP., LTD is entitled for the Defendant's wrongful acts.

When Congress enacted the Statute, it was specifically cognizant of the problems of theft of various wire communications, including closed-circuit programming, such as the Event. As stated in the House Bill:

> The Committee is extremely concerned with a problem which is increasingly plaguing the cable industry-the theft cable service. This problem has taken on many forms from the manufacture and sale of equipment intended to permit reception of cable services without paying for it, to apartment building dwellers "tapping" into cable system wire in a building's hallway that issued for providing service to a neighbor's apartment unit, to the sale by building superintendents of cable converters left behind by previous tenants to new tenants. Such practices does not only often permit one to obtain cable service without paying the installation and hookup costs, but also, for instance, involve individuals gaining access to premium movie and sports channels without paying for the receipt of those services.

> Theft of services deprives the cable industry of millions of dollars of revenue each year which it should otherwise be receiving. The Committee believes that theft of cable service poses a major threat to the economic viability of cable operators and cable programmers, and creates unfair burdens on cable subscribers who are forced to subsidize the benefits that other individuals are getting by receiving cable service without paying for it.

Cable Communications Policy Act of 1984, House Report No. 98-934, 5 U.S. Cong. News. '84 Bd. Vol. -6, 4655, 4720. Moreover, according to Congress, these incidents threaten to undermine the satellite industry and adversely impact legitimate satellite dealers and satellite programmers who otherwise would be receiving payment for their programming or descrambling devices. See, U.S. v. Scott, 783 F.Supp. 280, 281 (N.D. Miss. 1992) (quoting 1984 U.S. Code Cong. & Admin. News 4655, 4746).

The impact of theft of this type is far-reaching throughout the entertainment industry. According to the Office of Cable Signal Theft of the National Cable Television Association, the cable industry loses an estimated 3 Billion Dollars annually as a result of the theft of cable signals. Cable Piracy Fact Sheet. Not only do these acts of theft cause legitimate businesses to lose money, but they also weaken the cable signal, thereby adversely affecting the quality of the picture received by authorized users. Id.

Theft has also adversely impacted the movie industry. Theft of American movies and television programming, including satellite and cable television programming, has increased 27% since 1990. News Release, March 18, 1992, Motion Picture Export Association of America, Inc. ("MPEAA"). According to Jack Valenti, MPEAA's Chairman and Chief Executive Officer, "[p]iracy is the single biggest problem facing the motion picture industry today". Id. These thefts cost the industry over 1.2 Billion Dollars annually. Id.

Similarly, the unauthorized interception, receipt and broadcast of the Event and other closed-circuit programming threatens the viability of the closed-circuit industry. There are no

6

countervailing social or policy considerations which justify the unauthorized interception of these broadcasts. Cf., ON/TV of Chicago v. Julien, 763 F.2d 839, 843 (7th Cir. 1985); Subscription Television of Greater Washington v. Kaufman, 606 F.Supp. 1540, 1544 (D.D.C. 1985).

In addition to the lost revenue which would have been derived from the delivery and exhibition of the Event to M & M Tavern and its patrons, KINGVISION PAY- PER- VIEW CORP., LTD should receive additional compensation to account for any profits gained by the Defendant for meals and/or drinks sold to the patrons as a indirect result of her unlawful acts. Moreover, KINGVISION PAY- PER- VIEW CORP., LTD should be further compensated as it has been deprived of the "value, benefits and profits derived" from the unauthorized broadcast of the Event to KINGVISION PAY- PER- VIEW CORP., LTD and its patrons as well as the value of "business investment, business opportunities and goodwill." See American Television and Communications Corp. v. Floken, Ltd., 629 F.Supp. 1462, 1466 (M.D. Fla. 1986). As a result of theft by the Defendants and others, KINGVISION PAY- PER- VIEW CORP., LTD has lost and will continue to lose as customers legitimate commercial establishments which are unwilling and financially unable to compete with those unauthorized commercial establishments, such as M & M Tavern, which steal sports and other closed-circuit programming. Because these unauthorized commercial establishments offer the stolen programming to their patrons for no fee or for a fee which is less than the authorized establishments are required to charge, the legitimate commercial establishments with the right to broadcast closed-circuit programming can not attract paying customers. As a result, the authorized commercial establishments fail to recover the sublicense fees paid, suffer the loss of patrons and incur financial loss. When the unauthorized commercial establishment advertises the availability of the stolen programming, the number of patrons at the unauthorized commercial establishment increases and, as a result KINGVISION PAY- PER- VIEW CORP., LTD and the authorized commercial establishments suffer additional losses.

Theft of closed-circuit broadcasts, such as the Event, by unauthorized commercial establishments, such as M & M Tavern, adversely affects both KINGVISION PAY- PER- VIEW CORP., LTD and its customers. KINGVISION PAY- PER- VIEW CORP., LTD pays substantial fees to obtain the right to sublicense the broadcast of closed-circuit programming to authorized commercial establishments. KINGVISION PAY- PER- VIEW CORP., LTD primary source of revenue is the sublicense fees which it charges to authorized commercial establishments for the right to broadcast closed-circuit sports and entertainment programming such as the Event.

Clearly, the Defendant's actions have the potential to erode the base of KINGVISION PAY-PER- VIEW CORP., LTD's customers. Each patron of M & M Tavern is lost as a future patron of authorized broadcasts. See Cox Cable Cleveland Area, Inc. v. King, 582 F.Supp. 376, 381 (E.D. Ohio 1983). But for the Defendant's unauthorized broadcast of the Event, all or some of the patrons of M & M Tavern would have become paying patrons and directly increased the fees paid to KINGVISION PAY- PER- VIEW CORP., LTD by its authorized commercial establishments.

Further, KINGVISION PAY- PER- VIEW CORP., LTD has suffered damage to its goodwill and reputation and loss of its right and ability to control and receive fees for the transmission of the Event. See Quincy Cablesystems, Inc., 640 F.Supp. at 1161. When negotiating sublicense fees, KINGVISION PAY- PER- VIEW CORP., LTD generally represents to legitimate commercial establishments the locations of other authorized commercial establishments licensed to receive

the programming. Therefore, when an unauthorized commercial establishment intercepts, receives and broadcasts closed-circuit programming, such as the Event, KINGVISION PAY-PER- VIEW CORP., LTD's reputation and goodwill suffers from what appears like a misrepresentation. Plaintiff should receive compensation from the Defendant for these losses suffered. Furthermore, an incalculable element of damages is the ill-will and possible loss of future business from legitimate commercial establishments which refuse to pay sublicense fees because they cannot compete with unauthorized commercial establishments which steal closed-circuit programming, such as the Event.

The continued viability of KINGVISION PAY- PER- VIEW CORP., LTD as a business concern depends upon the willingness and ability of legitimate commercial establishments to pay sublicense fees for the right to broadcast closed-circuit sports and entertainment programming, such as the Event. If such programming is made available to the public for no fee at unauthorized commercial establishments which have not purchased the right to broadcast such programming, legitimate commercial establishments will find no reason to purchase the right to legally broadcast this type of programming.

KINGVISION PAY- PER- VIEW CORP., LTD is operating a legitimate business of the type that Congress specifically sought to protect. That protection, however, is threatened by the Defendant's actions. This Court must use the full power of the Statute to punish the Defendant for her acts of theft. If rampant theft of service is allowed to go unpunished and KINGVISION PAY- PER- VIEW CORP., LTD and similar distributors of protected communications continue to suffer losses as a result of the theft, these businesses could be forced to curtail distribution of this programming, thereby depriving the people of the State of MASSACHUSETTS of the ability to view these sports and entertainment events.

Given the benefits which the Defendant received from the broadcasts of the Event and given the additional damages which the Plaintiff has suffered, it is fair and reasonable to assess against the Defendant and award to KINGVISION PAY- PER- VIEW CORP., LTD the maximum statutory damages provided for in §605(e)(3)©(i)(II)in the amount of $10,000.00 for his violation of the Statute by the exhibition of the Event. Accordingly, KINGVISION PAY- PER- VIEW CORP., LTD hereby requests the Court to assess against the Defendant and award it full statutory damages in the amount of $10,000.00 for the violation of the Statute. Counsel wishes also to point out to the Court that companion actions to the case at bar, filed simultaneously on virtually identical facts, have settled for an average of $5,000 dollars each. Similar cases filed by the undersigned in Massachusetts and Rhode Island also have settled for an average of over $5,000. These settlements were reached to avoid the necessity of protracted pleadings, discovery, and enforcement of a judgment. This defendant should not be entitled to better treatment than a settling party.

## CONCLUSION

The need for substantial awards to compensate those aggrieved under the Statute and to deter the Defendant and similar individuals and entities has already been recognized in this jurisdiction and other jurisdictions. For the reasons set forth herein, the Plaintiff respectfully requests the aforesaid relief.

Respectfully submitted,

GARY D. BERKOWITZ, ESQ. #632536
One James Street
Providence, RI 02903
Tel (401) 751-7671    fax:751-1146

## CERTIFICATION

I certify that I mailed a copy of this motion, memorandum, and accompanying materials to Torri and Darryl Canada, at 454 Blue Hill Avenue, Boston, MA 02121 this 9th day of September, 2005.

MA5

# AFFIDAVIT

**State of Massachusetts**
**County of Suffolk**

I, the undersigned, being duly sworn according to law deposes and says, that I am over the age of eighteen (18) years, of sound mind, competent to testify as to the matters contained herein, personally acquainted with the facts stated herein, and state that they are true and correct. On Saturday, March 1, 2003, I entered the establishment known as M&M Tavern, 454 Blue Hill Avenue, Roxbury, Massachusetts, 02119, at approximately 10:05 p.m. There was not a cover charge to enter this establishment. There was a doorman.

There were two bartenders. One bartender was a black male approximately 23 years old, 5'10", 180 lbs., with dark clean cut hair. The other bartender was a black male approximately 23 years old, 6'3", 200-220 lbs., with his hair worn in an Afro.

I observed 2 television sets. One television set was located directly in front over the bar and the other television set was located at the end of the bar. I noted that it was the start of round 8 of a match between Winky Right, who was wearing red trunks with black trim, vs: Juan Carlos Candelo, who wore gold trunks with blue and red trim. Candelo also had an advertisement for Gold Palace Casino on his back.

I also noted that the ring floor was blue and that the ropes were red, white and blue in color. I noted that the logos on the ring floor were for Caesar's Palace and CMXchange.

A cable box was not visible. This establishment does not have a satellite dish/direct TV visible. There were not apartments above or adjacent to the establishment. The establishment is described as a bar.

The capacity of this establishment is approximately 30 people. At the time of my appearance, I counted approximately 15 people on the first head count and 20 on the second count.

Prior to my departure, there were approximately 20 people in the establishment. This establishment is located in a commercial/residential neighborhood. There was not a parking lot adjacent to this establishment.

I departed this establishment at 10:18 p.m.

Signed: _Codey Waller 3/12/03_
Codey Waller

On March 12, 2003, before me, Debra A. D'Ambrosio, Notary Public, personally appeared Codey
Waller, personally known to me and acknowledged to me that he executed the same in her
authorized capacity and that by his signature on the instrument the person or the entity upon
behalf of which the person acted, executed the instrument.

Witness my hand and official seal

_Debra A. D'Ambrosio_

Debra A. D'Ambrosio

Debra A. D'Ambrosio
Notary Public
My Commission Expires
March 13, 2009